UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────────

PATRICK LOPRESTI, as Trustee of ALA-
LITHOGRAPHIC INDUSTRY PENSION PLAN,            10 Civ. 9462 (JGK)

                         Plaintiff,           OPINION AND ORDER

          - against –

PACE PRESS, INC., PBS LITHO, INC., DG3
NORTH AMERICA, INC., JACK MANGIARACINA,
JONATHAN VITALE, and SETH DIAMOND,
                         Defendants.

─────────────────────────────────────

JOHN G. KOELTL, District Judge:


## INTRODUCTION

     The plaintiff, Patrick LoPresti, brought this action as

Trustee of the ALA-Lithographic Industry Pension Plan (the

"Plan"), against Pace Press, Inc. ("Pace Press"), PBS Litho,

Inc., DG3 North America, Inc. ("DG3"), and Jack Mangiaracina,

Jonathan Vitale, and Seth Diamond ("the Individual Defendants"

or "the Principals").  The plaintiff seeks to recover withdrawal

liability it claims is owed to the Plan pursuant to the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.

§ 1001 et seq., following the complete withdrawal of Pace Press

from the Plan and the sale of Pace Press to DG3 in October 2008.

A default judgment was entered against Pace Press in November

2009 in a separate case, awarding the Plan $1,326,312.86.  The

plaintiff now brings this action asserting that it is entitled

to recover from the defendants the withdrawal liability it is

owed because a principal purpose of the sale transaction was to evade or avoid withdrawal liability within the meaning of section 4212(c) of ERISA, 29 U.S.C. § 1392(c), such that liability should therefore be determined and collected without regard to the transaction in question.

In May 2011, the Court denied a motion by DG3 to dismiss the complaint against it pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court subsequently conducted a non-jury trial on April 23, 24, and 25, 2012. The Court now makes the following findings of fact and reaches the following conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

### I.   Parties

1.   Patrick LoPresti is a Trustee of the ALA-Lithographic Industry Pension Plan (the "Plan"). (Stipulation of Facts ("Stip.") ¶ 1.)

2.   The Plan is an "employee benefit plan" within the meaning of sections 3(2) and 3(3) of ERISA, 29 U.S.C. §§ 1002(2) and (3). (Stip. ¶ 2.)

3.   The Plan is a "defined benefit plan" within the meaning of section 3(35) of ERISA, 29 U.S.C. § 1002(35), and is maintained for the purpose of providing retirement and related

benefits to eligible participants and beneficiaries. (Stip. ¶ 3.)

4. The Plan is a "multiemployer plan" within the meaning of section 3(37)(A) of ERISA, 29 U.S.C. § 1002(37)(A). (Stip. ¶ 4.)

5. The Plan is a jointly administered employee benefit trust fund, established and maintained pursuant to § 302(c) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5). (Stip. ¶ 5.)

6. The Plan maintains its office at 113 University Place, New York, New York 10003. (Stip. ¶ 6.)

7. DG3 is a corporation organized under the laws of the State of New Jersey and maintains its office and principal place of business at 100 Burma Road, Jersey City, New Jersey 07305. (Stip. ¶ 15.)

8. Pace Press was a corporation organized under the laws of the State of New Jersey and maintained its office and principal place of business at 1 Caesar Place, Moonachie, New Jersey 07074. (Stip. ¶ 8.)

9. Pace Press was a member of the Metropolitan Lithographers Association, Inc. ("MLA"), and, as such, was a party to a collective bargaining agreement covering the period of July 1, 2005 through June 30, 2009 with Local One-L, Amalgamated Lithographers of America, GCC/IBT ("Local 1"). The

collective bargaining agreement covered a unit of workers employed by Pace Press and obligated Pace Press to make periodic contributions to the Plan for the purpose of providing retirement benefits to covered workers. (Stip. ¶¶ 10-12.)

10.  Jack Mangiaracina was President and a shareholder of Pace Press. (Stip. ¶ 16.)

11.  Seth Diamond was an Executive Vice President and a shareholder of Pace Press. (Stip. ¶ 18.)

12.  Jonathan Vitale was an Executive Vice President and a shareholder of Pace Press. (Stip. ¶ 19.)

13.  PBS Litho, Inc. was a corporation organized under the laws of the State of New Jersey and maintained its office and principal place of business at 1 Caesar Place, Moonachie, New Jersey 07074. (Stip. ¶¶ 13, 14.)

**II.  Witnesses**

14.  Joseph Lindfeldt, Jack Mangiaracina, Chad Staller, Jonathan Vitale, Seth Diamond, and Patrick LoPresti testified at the trial.

15.  The parties also entered into evidence deposition testimony from Michael Kovarik and Scott Kennedy, both of whom were employed by Merrill Lynch Financial Corporation ("Merrill Lynch") at the time Pace Press was winding down its business. (Tr. 357-58, 369-70.)

### III.   Pace Press's Loan and Security Agreement with Merrill Lynch

16.   In December 1998, the Pace Press Principals entered into a loan and security agreement including an Unconditional Guaranty with Merrill Lynch in order for Merrill Lynch to "advance moneys or extend or continue to extend credit or lease property" to Pace Press.  (Stip. ¶ 20.)

17.   The Unconditional Guaranty was a joint guaranty that made each of the Principals personally jointly and severally liable for the credit extended to Pace Press.  (Stip. ¶ 21.)

18.   The aggregate maximum personal liability to Merrill Lynch by the Principals under the 1998 agreement was $500,000.  (Stip. ¶ 22.)

19.   In April 1999, Pace Press secured a $1 million line of credit from Merrill Lynch.  (Stip. ¶ 24.)

20.   In November 2006, in order to purchase a new printing press, Pace Press entered into a Term Loan and Security Agreement with Merrill Lynch for a loan of approximately $2,100,000.  (Stip. ¶¶ 25, 31.)

21.   To effectuate this loan, each of the Principals signed another personal guaranty, incurring an additional liability of $100,000 each.  (Stip. ¶ 27.)

22.   The addition of the guaranties imposed by the November 2006 loan to those from the December 1998 loan brought the total

personal and joint and several guarantied liability to Merrill Lynch for each Principal to $600,000:  the $500,000 aggregate from the 1998 loan, plus $100,000 for each of the three Principals from the 2006 loan.  (Stip. ¶¶ 28, 29.)

23.  By November 2006, Pace Press's line of credit with Merrill Lynch had increased to over $2 million.  (Stip. ¶ 26.)

24.  In October 2007, Pace Press finalized a sales agreement with Mitsubishi Lithographic Presses in connection with the purchase of a Mitsubishi Diamond 3000LS-8 Eight-Color Sheetfed Printing Press for a purchase price of approximately $2,165,000.  (Stip. ¶ 32.)

## IV.   Pace Press's Financial Difficulties and Search for a Potential Buyer

25.  At some point during 2007-2008, Pace Press experienced a decline in sales.  (Stip. ¶ 35.)

26.  In late 2007 and early 2008, Pace Press had discussions with other printing companies, including Pictorial Offset and Tanagraphics, about potentially selling Pace Press. (Stip. ¶ 36.)

27.  During the discussions with Pictorial Offset, the Principals were advised by representatives of Pictorial that if Pace Press were to incur withdrawal liability to the Plan, the liability would be approximately $1 million.  (Stip. ¶ 40.)

28.   Transactions with Pictorial Offset and Tanagraphics were not consummated because both entities required Pace Press to file for bankruptcy protection as a prerequisite to any acquisition.  (Tr. 287-89, 392-93.)

29.   Around the time of these discussions, Pace Press retained bankruptcy counsel, who advised Pace Press that the only way it could exist going forward would be to go bankrupt. (Tr. 393.)

30.   At this time, the liabilities of Pace Press exceeded the value of its assets.  (Tr. 288, 395.)

31.   Kovarik testified that, as of August 14, 2008, he viewed the situation of Pace Press as "relatively bleak"; it had lost its two largest customers and he thought that if Pace Press could not find a buyer its only other option would be bankruptcy.  (Tr. 359-61.)

32.   The Principals would not agree to file for bankruptcy because of their exposure under the personal guaranties they had provided to Merrill Lynch.  (Tr. 288-89, 430.)

33.   As of August 14, 2008, the amount of outstanding loans from Merrill Lynch to Pace Press was $4,185,374.33.  (Stip. ¶ 34.)

34.   On August 25, 2008, Merrill Lynch issued a Notice of Default to Pace Press and the Pace Press Principals, notifying them of Pace Press's default on its financing from Merrill

Lynch.  (Tr. 366-68, 394, 415, 417; Joint Trial Ex. ("Ex.")
157.)

35.  The events of default included the failure to maintain
the minimum tangible net worth as required by the loan
documents.  (Ex. 157.)

36.  At the same time that Merrill Lynch sent these default
letters, it also sent direct pay letters to the customers of
Pace Press demanding that they pay any debts owed to Pace Press
directly to Merrill Lynch.  The impact of this letter on the
customers and suppliers of Pace Press was perceived by the
Principals as devastating and as eliminating any chance that
Pace Press could stay in business.  (Tr. 395-96, 415-17.)

37.  Merrill Lynch also put a freeze on the Principals'
personal accounts with Merrill Lynch, including their mortgages
and checking accounts.  (Tr. 262-63, 417.)

**V.  Negotiations Between Pace Press and DG3**

38.  At some point in 2008, Mangiaracina was contacted by a
salesperson at DG3.  DG3 had heard about "financial difficulties
with Pace," and the salesperson directed Mangiaracina to contact
DG3 CEO Michael Cunningham so they could discuss "maybe getting
together."  (Tr. 245-46.)

39.   In or about June 2008, Mangiaracina met for the first time with Cunningham to discuss a possible deal with Pace Press. (Stip. ¶ 43.)

40.   DG3 and Pace Press were competitors in the printing industry and there was no corporate affiliation between them. (Tr. 168.)

41.   Joseph Lindfeldt is the Executive Vice President for Corporate Development of DG3.  (Tr. 35.)

42.   Negotiations between DG3 and Pace Press occurred in 2008, with Lindfeldt representing DG3 and the Pace Press Principals representing Pace Press.  (Stip. ¶ 45.)

43.   At some point after July 11, 2008, DG3 decided that it wanted to purchase the tangible assets and customer list of Pace Press.  (Tr. 45.)

44.   Lindfeldt and Mangiaracina discussed how to structure a transaction between DG3 and Pace Press, including options such as a stock purchase, purchase of one or more of the entities, and an asset purchase.  The transaction was ultimately structured as an asset purchase.  (Stip. ¶ 46; Ex. 35.)

45.   Sometime in August 2008, DG3 prepared a draft Letter of Intent which outlined a proposal to purchase certain assets of Pace Press.  (Stip. ¶ 48; Ex. 23.)

46.   The draft Letter of Intent included a chart titled Conditions Precedent to Closing, the first item of which was a proposed "Local 1 Pension Settlement."  The Settlement proposed:

> A legally binding settlement between Pace, DG3 and the Local 1 Amalgamated Lithographers Union which will include a full release from Local 1 for the Benefit of Pace and DG3 in connection with any and all liabilities to Local 1 in exchange for a one-time contribution to Local 1 of $200,000, to be paid by Pace.

(Ex. 23 at DG3001239.)

47.   The Conditions Precedent chart of the draft Letter of Intent also indicated that the transaction between Pace Press and DG3 would require "Employment agreements of sales personnel," specifically:  "The entering into of employment agreements containing all customary terms and conditions with each of the [Principals] and any sales personnel DG3 wishes to employ in connection with the transaction."  (Ex. 23 at DG3001239.)

48.   DG3 entered into a final Non-Binding Letter of Intent with Pace Press on August 11, 2008.  (Ex. 24; Tr. 70-71.)

49.   The final Letter of Intent contained substantially the same proposal for DG3's purchase of the assets of Pace Press and also included a chart titled Conditions Precedent to Closing. (Ex. 24 at DG3000517.)

50.   In the final Letter of Intent, the condition concerning the "Local 1 Pension Settlement" was altered,

providing for:  "A release in favor of DG3 from the trustees of

the multiemployer union pension plan (the 'Union Pension Plan')

covering the unionized employees of Pace for any withdrawal

liability that Pace now owes or may owe in the future to the

Union Pension Plan."  (Ex. 24 at DG3000517.)

51.  The final Letter of Intent, like the draft Letter of

Intent, contained a condition precedent requiring that DG3 enter

into employment agreements with the Pace Press Principals.  (Ex.

24 at DG3000513 and DG3000517.)

52.  The purchase price contemplated by the final Letter of

Intent was $3,250,000.  (Ex. 24 at DG3000512.)

53.  Discussions regarding the sale transaction continued

after the final Letter of Intent.  (Stip. ¶ 50.)

## VI.  Wind Down Agreement Between Merrill Lynch and Creation of Unsecured Creditors' Pool

54.  Merrill Lynch had a lien on all of Pace Press's

assets.  The purchase of Pace Press's assets could not be

accomplished without Merrill Lynch releasing its security

interests in those assets.  (Tr. 359.)

55.  Although Merrill Lynch had the "leverage" to put an

end to the negotiations if it was not satisfied with the money

it was to be paid as a result of the transaction, it recognized

that it would have to accept something less than the more than

$4 million it was owed by Pace Press.  It also feared that, if

11

negotiations dragged on too long, DG3 could walk away from the
deal, leaving Merrill Lynch in an even worse position.  (Tr.
362-64.)

56.  On September 4, 2008, DG3 increased its offer by
$100,000, to $3,350,000, as an incentive to Merrill Lynch to
approve the transaction.  Lindfeldt testified that this offer
was extended because, the longer the process continued, the more
expenses DG3 would incur, the more likely the customers of Pace
Press would be to hear about Pace Press's demise, and the less
likely the transaction would be to close.  (Tr. 76-77; Ex. 25.)

57.  On September 15, 2008, Merrill Lynch and Pace Press
entered into a Wind Down Agreement under which Merrill Lynch (a)
agreed, for $2,900,000, to release its security interests in the
assets being purchased by DG3 and (b) approved the sum of
$450,000 to be paid to the unsecured creditors of Pace Press.
(Ex. 33 at ¶ 2.)

58.  The Wind Down Agreement also provided that the assets
of the Principals held by Merrill Lynch pursuant to their
personal guaranties would be released in the event that Merrill
Lynch received payments from the proceeds of accounts receivable
equal to or in excess of $1 million within 120 days of the
execution of the Wind Down Agreement.  (Ex. 33 at ¶ 5; Tr. 277.)
Further, the Wind Down Agreement provided that the Principals
would remit to Merrill Lynch fifty percent of any bonuses earned

as a result of their employment with DG3 in the two years following the Wind Down Agreement.  (Ex. 33 at ¶ 6.)

59.  With respect to the payment to unsecured creditors, the Wind Down Agreement provided that DG3 would pay Pace Press $450,000 "or such greater amount agreed to by [Merrill Lynch], to be used by [Pace Press] for settlement of claims asserted against it by its unsecured creditors (including [Pace Press's] obligations under its Union retirement plan)."  (Ex. 33 at ¶ 2.)

60.  Pace Press created the $450,000 pool for its unsecured creditors.  (Stip. ¶ 62.)

61.  An ad hoc committee of Pace Press's unsecured creditors, excluding the Plan, was formed on or about September 10, 2008.  (Ex. 195 at D0000390; Tr. 272.)

62.  In mid-September, the unsecured creditors were presented with a proposed settlement that would provide them with a recovery of ten cents on the dollar for their claims against Pace Press.  (Tr. 107.)

63.  The decision to offer the unsecured creditors ten cents on the dollar was made by Allen Wilen, who was Pace Press's bankruptcy advisor.  (Tr. 188-89.)

64.  On or about September 19, 2008, Pace Press provided the committee of unsecured creditors with information regarding Pace's finances.  Among the documents provided was a series of question-and-answer points responding to queries by the

creditors.  The response to a question about the potential
withdrawal liability of Pace Press noted that the liability
"could exceed 1.5 million."  (Ex. 55 at PL0000186-187.)

65.  On October 3, 2008, Merrill Lynch and Pace Press
entered into an Amended Wind Down Agreement, which made no
changes other than to certain terms concerning the treatment of
Pace Press's accounts receivable.  (Ex. 33 at ¶ 4; Ex. 34 at ¶
4.)

66.  By letter agreement dated October 27, 2008, Pace Press
notified its unsecured creditors that certain of its assets
would be sold to DG3 for $3,350,000 and that the company was in
the process of winding down its operations in anticipation of
dissolution.  (Stip. ¶ 60; Ex. 195 at D0000389.)

67.  The October 27 letter indicated that the anticipated
sale would also involve setting aside $450,000 as a settlement
payment to Pace Press's unsecured creditors, to be distributed
on a pro rata basis to those unsecured creditors who agreed with
the arrangement and submitted claims.  (Ex. 195 at D0000391.)

68.  The agreement was not to become effective until:

> Pace, the Disbursing Agent, and Creditors who hold in the
> aggregate not less than seventy-five percent (75%) of the
> total amount of Pace's unsecured debt listed on Exhibit A
> (exclusive of withdrawal liability indebtedness in
> connection with the multiemployer Union Pension Plan with
> the Local One-L, GCC, IBT to which Pace is a party . . .),
> shall have executed and delivered to the Disbursing Agent
> this Agreement and the Disbursing Agent shall certify

receipt and provide proof of the requisite unsecured
creditor consents . . . .

(Ex. 195 at D0000392.)

69.  The October 27 letter was not sent to the Plan and the
Plan was not offered an opportunity to participate pro rata in
the $450,000 pool.  (Stip. ¶ 61.)

70.  According to Kovarik, Merrill Lynch did not actually
dictate what creditors should participate in the $450,000 pool
or express an opinion regarding whether the Plan should be
included in that pool.  (Tr. 350, 356.)

71.  Mangiaracina understood that the unsecured creditors
did not want the Plan to participate in the $450,000 pool
because the estimated million-dollar withdrawal liability would
have diluted the pool, reducing any recovery the creditors
anticipated as a result of the settlement.  (Tr. 281.)
Mangiaracina also testified that the Plan was not included in
the $450,000 pool because Pace Press had not yet withdrawn from
the Plan at that time.  (Tr. 207.)  Therefore, there was no
current withdrawal liability and the Plan was in a different
position from creditors to whom Pace Press owed current debts.

72.  The unsecured creditors of Pace Press that
participated in the $450,000 pool eventually secured a 17.3%
recovery of their claims against Pace.  (Stip. ¶ 65.)

**VII.  Parties' Discussions about Withdrawal Liability and Settlement Offer to the Plan**

73.  As of June 19, 2008, Lindfeldt was aware that Pace Press was a contributor to a multiemployer pension plan and he learned of Pace Press's withdrawal liability to the Plan early in the negotiations.  (Tr. 46.)  At some point between the initial June 2008 Pace Press-DG3 meeting and August 11, 2008, Mangiaracina discussed Pace Press's withdrawal liability with Lindfeldt and apprised him of the estimated $1 million figure for this liability.  (Tr. 252-55.)

74.  Lindfeldt testified at trial that the "union pension plan" was one of the seven things he brought up on every conference call and that he brought up the pension fund withdrawal liability regularly.  (Tr. 88, 119-20.)

75.  The draft Letter of Intent and the final Letter of Intent included as a condition precedent to the closing of the transaction a release in favor of DG3 for any withdrawal liability owed by Pace Press.  (Ex. 23 at DG3001239; Ex. 24 at DG300517.)

76.  DG3 was subsequently advised by counsel that it would not have exposure for the withdrawal liability of Pace Press by entering into the transaction with Pace Press because DG3 was only purchasing certain assets and not acquiring the stock of Pace Press.  (Tr. 51, 78-79, 174.)

77.   Based on this advice of counsel, by mid-September 2008, DG3 was prepared to complete the transaction with Pace Press without a release from the Plan for withdrawal liability. However, Lindfeldt testified that he would have preferred to settle the issue to avoid potential litigation in the future. Lindfeldt believed that DG3 might be sued over withdrawal liability even if the litigation was frivolous.  (Tr. 116-17, 153, 176.)

78.   DG3 and Pace Press discussed a settlement with the Plan that would release DG3 from withdrawal liability owed by Pace.  (Tr. 252-53.)

79.   By letter dated September 30, 2008, Keith McMurdy of Fox Rothschild LLP, attorneys for Pace Press, contacted Thomas M. Kennedy, counsel for the Plan.  The letter advised that "Pace is closing its operations and in connection with that closing, selling its assets to DG3" and indicated that "we have been advised by Merrill Lynch that Pace may allocate up to Fifty Thousand Dollars ($50,000.00) from the sale of the proceeds to extend an offer to the Fund in exchange for a general release of DG3 of any claims that could be made by the Fund against it relating to this transaction."  The letter noted that "[t]his proposal is not intended to act as a release or bar to any claim against Pace for any liability the Fund may believe exists but

as a good faith effort to resolve any perceived claim against
DG3 as the acquiring entity." (Ex. 51 at PL0000132.)

80. Pace Press and DG3 discussed how the $50,000 offered
to the Plan should be allocated. An October 6, 2008 email
message from Jordan Fisch of Cole Schotz, Pace Press's
bankruptcy counsel, to Lindfeldt, explained:

> [Pace Press] always intended to allocate and pay $50,000 to
> the union to get the release sought and that if we could
> not get the release (which we are still pursuing), those
> funds would be paid to the unsecureds to incentivize them
> to deliver the release needed from them. It has become
> very apparent to us that the union is not interested in
> delivering a release for $50,000, and we need the
> additional $50,000 in order to line up the unsecureds.
> There will be no payment to the union if we do the deal
> with the unsecureds.

(Ex. 87 at DG3005824.)

81. On October 24, 2008, Lindfeldt, in an email message to
Cunningham, suggested that DG3 should retain from the
transaction purchase price the $50,000 offered to the Plan
because DG3 would need the funds to defend against legal claims
by Local One. (Ex. 126; Tr. 153.)

82. Ultimately, the Plan did not accept the $50,000 offer
and this money was not subtracted from the transaction purchase
price but instead became part of the $450,000 pool allocated to
the unsecured creditors. (Tr. 163.)

**VIII.  DG3's Business Case and Valuation of the Assets of Pace Press**

83.  On or about October 4, 2008, DG3 provided the DG3 Board of Directors and the operating committee of Arsenal Capital Partners ("Arsenal") - the majority owner of DG3 - with a report entitled "Project PacMan Business Case," which was a strategic justification for acquiring the assets of Pace Press that Lindfeldt had prepared.  (Stip. ¶ 58; Tr. 148; Ex. 78.)

84.  The Business Case presented three scenarios or projections in connection with DG3's acquisition of the assets of Pace Press:  (1) the downside case, (2) the base case, and (3) the synergy case.  (Ex. 78.)  Lindfeldt testified that the downside case was the worst-case scenario, the synergy case was the best-case scenario, and the base case was the most likely scenario.  (Tr. 148-49.)

85.  In all three scenarios, the fair market value of Pace Press' tangible assets was valued at $2.7 million.  (Tr. 149; Ex. 78 at DG3003904.)

86.  According to the Business Case, DG3 estimated the total value of the tangible and intangible assets of Pace Press as ranging from $5.2-$12.9 million, depending on the scenario assumed.  (Ex. 78 at DG3003904.)

87.  The plaintiff's expert witness, Chad Staller, of the

Center for Forensic Economic Studies, testified that the assumptions and methodology employed by DG3 in the Business Case were within reason and completed within normal business valuation techniques.  (Tr. 312.)  Staller also concluded that the fair market value for Pace Press's assets was between $5.2-$12.9 million, the same estimate presented in the Business Case. (Tr. 310.)  Staller thus concluded that DG3 did not pay fair market value for Pace Press's assets, because DG3 paid less than this amount.  (Tr. 321-23.)

88.  However, Staller's testimony was not persuasive. Staller's analysis was flawed, given that he testified that he did not consider the possibility of a bankruptcy of Pace Press or have any information about whether the liabilities of Pace Press exceeded its assets, factors which, he conceded, could have altered the valuations set forth in the Business Case. (Tr. 331-32.)  Staller also did not inquire from other companies what they would have paid to acquire Pace Press.  (Tr. 338.) Given that two other companies had refused to enter into transactions with Pace Press unless it filed for bankruptcy protection, this undercuts Staller's conclusion that Pace Press was worth more than what DG3 paid for it.

89.  Moreover, Lindfeldt credibly testified that the Business Case overstated the actual value of the assets of Pace Press because it did not account for the infusion of

capital from Arsenal needed to finance the transaction, which had the effect of diluting DG3's current equity. (Tr. 177-78.) Lindfeldt testified that, taking into account the effect of the infusion of capital, as well as the high risk nature of the transaction, the appropriate discount rate to apply to the discounted cash flow analysis should have been much higher. (Tr. 193-96.)

90. As the plaintiff's expert conceded, the dilution of DG3's equity was a legitimate business reason for DG3 not to pay more than $3.35 million for the assets of Pace Press. (Tr. 328.)

91. Lindfeldt testified credibly at trial that Pace Press was worth less than $4 million and that the transaction was a very expensive one for which he believes DG3 overpaid. (Tr. 178-79.)

92. Thus, DG3 did not pay less than fair market value for the assets of Pace Press.

## IX. Final Asset Purchase Agreement between DG3 and Pace Press

93. On October 31, 2008, Pace Press, the Pace Press Principals, and DG3 entered into an Asset Purchase Agreement, which finalized the negotiations that had taken place over the preceding months. (Ex. 35.)

94.   The purchase price set forth in the APA was
$3,350,000.  (Ex. 35 at ¶ 2.5.)

95.   The APA did not require any release from the Plan on
behalf of DG3 as a condition to the sale.  (Ex. 35.)

96.   The salient provisions of the APA were as follows:

a) DG3 would acquire specifically enumerated assets from
   Pace Press, including: (1) the newly purchased Mitsubishi
   Diamond printing press; (2) a Heidelberg printing press;
   (3) Pace's customer list; and (4) certain customer
   contracts.  (Ex. 35 at DG3004767-4768.)

b) DG3 would enter into employment agreements with the Pace
   Press Principals.  (Ex. 35 at ¶ 6.2(g).)

c) The Principals would be jointly and severally liable for
   indemnifying DG3 and holding DG3 harmless from and
   against any liability of Pace Press not expressly assumed
   by DG3.  (Ex. 35 at ¶ 5.1(b).)

d) DG3 was to "have no responsibility for any of [Pace's]
   obligations under the Collective Bargaining Agreement
   between [the MLA] and [Local 1] or [Pace's] obligations
   to the multiemployer Pension Plan in which [Pace] is a
   participant."  (Ex. 35 at ¶ 2.4.)

97.   On October 31, 2008, the Pace Press Principals entered
into individual employment agreements with DG3.  The salient

22

provisions of these agreements, all three of which contained substantially similar terms, were as follows:

a) Each of the Principals was to be employed at DG3 as a Vice President of Sales for an initial term of at least one year.

b) During the first year of employment, each of the Principals was to earn a minimum of $206,000. Compensation in subsequent years was to be based on commission.

c) In addition to the first-year compensation of $206,000, the Principals would be eligible for a bonus of $100,000 each year for the first two years, if they met certain revenue benchmarks.

(Exs. 45, 69, 92.)

98. DG3 entered into the employment agreements with the Principals because the Pace Press customer list that DG3 purchased did not come with any guaranteed level of future business or contract assignments, and thus obtaining repeat work from Pace Press customers would depend on the long-term relationships that the Pace Press Principals had with those customers. (Tr. 46, 171-73, 181, 410-11.)

99. The amount of compensation set forth in the employment agreements with the Pace Press Principals was the result of intensive negotiations between Diamond and Lindfeldt and was within reason based on the Principals' historic earnings

at Pace and industry standards for similar positions, as Staller
conceded.  (Tr. 174, 260, 325, 414.)

100.  Kovarik testified that he did not remember Merrill
Lynch having any concerns that the employment agreement
provisions were too generous but that Merrill Lynch did believe
it was entitled to any money coming to the Principals, given
that the Principals were seeking a release from their personal
guaranties.  (Tr. 348, 351, 365-66.)  Kovarik testified that the
requirement that the Principals remit fifty percent of their
bonuses to Merrill Lynch was likely imposed to address this
concern.  (Tr. 352.)  Kennedy testified that Merrill Lynch
wanted to ensure that DG3 did not pay less for the assets than
it would normally pay and then compensate the Principals
directly through inordinately high salaries.  Kennedy testified
that Merrill Lynch reviewed the employment agreements with this
concern in mind before agreeing to the transaction.  (Tr. 371-
72, 379-80.)

101.  The Principals each paid $60,000 of their personal
guaranties owed to Merrill Lynch.  (Stip. ¶ 67.)

102. Kennedy testified that Merrill Lynch's financial loss
as a result of the transaction was approximately $400,000.  (Tr.
388.)

103.  None of the money paid by DG3 under the Asset Purchase Agreement reverted to DG3 or to the Principals.  (Tr. 170.)

## X.  Pace Press's Dissolution and Withdrawal from the Plan

104. By letter to Mangiaracina dated November 20, 2008, from Elizabeth Pilecki, the Plan's counsel made a demand on Pace Press for the payment of withdrawal liability.  (Ex. 56; Tr. 233-34.)  The letter informed Pace Press that its withdrawal liability was $1,237,363 and directed Pace Press to make its first payment of $34,144.75 toward the total liability amount by January 20, 2009.  (Ex. 56 at PL0000109-PL0000110.)

105. Mangiaracina did not notify Merrill Lynch that he received the November 20, 2008 letter; however, he did have a discussion with Lindfeldt in which he advised Lindfeldt of the withdrawal liability amount set forth in the letter.  (Tr. 235.)

106. After the completion of the transaction with DG3, Pace Press still had some assets.  Mangiaracina testified that, as of November 20, 2008, Pace Press still had between $75,000 and $200,000.  In November 2008, Pace Press was collecting funds from accounts receivable and submitting proceeds to Merrill Lynch, while keeping some funds to cover certain costs and expenses such as attorney's fees.  Mangiaracina testified that Merrill Lynch would only allow Pace Press to use these assets

for certain purposes, which did not include the satisfaction of withdrawal liability.  (Tr. 223, 235, 276.)

107. Pace Press used some of its remaining assets to settle a claim made by the Local One Union for severance pay and accumulated vacation and sick pay for $75,000 after the sale transaction with DG3.  (Tr. 223-25.)

108. Pace Press made no payment toward the withdrawal liability it owed, nor did it challenge the Plan's assertion of withdrawal liability.  (Tr. 235-36.)

109. Pace Press was dissolved without assets in February 2010.  (Stip. ¶ 9.)

## CONCLUSIONS OF LAW

1.   To the extent that any of the foregoing findings of fact is a conclusion of law, it is hereby adopted as a conclusion of law.

## I.   Jurisdiction

2.   The Court has subject matter jurisdiction over this case pursuant to 29 U.S.C. §§ 1132(a)(3)(B)(ii), (d)(1), (e)(2), and (f), and 29 U.S.C. §§ 1451(a) and (c).

3.   Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 29 U.S.C. § 1451(d), because the Plan is administered and maintains its office within this District.

**II.  The Plan Has Established That It Is Owed Withdrawal Liability.**

4.  Pace Press was an "employer" within the meaning of section 3(5) of ERISA, 29 U.S.C. § 1002(5).  (Stip. ¶ 7.)

5.  Pace Press withdrew from the Plan on October 24, 2008 in a complete withdrawal by permanently ceasing all covered operations under the Plan, within the meaning of sections 4201(a) and 4203(a)(1) or (2) of ERISA, 29 U.S.C. §§ 1381(a) and 1383(a)(1) or (2).  (Stip. ¶ 68.)

6.  Such a complete cessation of the obligation to make contributions or cessation of covered operations constituted a "complete withdrawal" from the Plan, for which withdrawal liability may be collected by the Plan, pursuant to section 4201(a) of ERISA, 29 U.S.C. § 1381(a).  Under ERISA, an employer that withdraws from a multiemployer pension plan can be required to pay the plan a sum approximating the vested but unfunded benefits attributable to the employer's employees.  29 U.S.C. § 1381 et seq.  The purpose of this withdrawal liability, which is enforceable in a suit by the pension plan, "is to relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers."  HOP Energy, L.L.C. v. Local 553 Pension Fund, 678 F.3d 158, 161 n.2 (2d Cir. 2012) (quoting Park S. Hotel Corp. v. N.Y. Hotel Trades

Council, 851 F.2d 578, 580 (2d Cir. 1998)); ILGWU Nat'l Ret.
Fund v. Levy Bros. Frocks, Inc., 846 F.2d 879, 881 (2d Cir.
1998) (quoting H.R. Rep. No. 96-869, Part I, 96th Cong., 2d
Sess. 51 at 67 (1980)).

7.   In September 2009, the Plan sued Pace Press for
withdrawal liability in the Southern District of New York.
(Complaint, ALA Lithographic Indus. Pension Plan v. Pace Press,
Inc., No. 09 Civ. 8139 (S.D.N.Y. Sept. 23, 2009), ECF No. 1; Ex.
57.)  On November 13, 2009, a default judgment was entered in
that case awarding the plaintiff, the Plan, a judgment against
Pace Press in the amount of $1,326,312.86, which included a
principal amount of $1,237,263 as well as interest and costs.
Default Judgment, ALA Lithographic Indus. Pension Plan v. Pace
Press, Inc., No. 09 Civ. 8139 (S.D.N.Y. Nov. 13, 2009), ECF No.
6; Ex. 58.)

## III.  Evade or Avoid Liability Under 29 U.S.C. § 1392(c)

8.   The Plan contends that a principal purpose of the sale
transaction was to evade or avoid withdrawal liability of Pace
Press within the meaning of section 4212(c) of ERISA, 29 U.S.C.
§ 1392(c), which provides as follows:  "If a principal purpose
of any transaction is to evade or avoid liability under this
part, this part shall be applied (and liability shall be
determined and collected) without regard to such transaction."

29 U.S.C. § 1392(c).  The plaintiff contends that it is therefore entitled to recover from the defendants the withdrawal liability it is owed.

9.   The terms used in § 1392(c) are not defined in the statute and therefore should be construed in accordance with their ordinary meaning.  SUPERVALU, Inc. v. Bd. of Trs. of Sw. Penn. & W. Md. Area Teamsters & Emp'rs Pension Fund, 500 F.3d 334, 340 (3d Cir. 2007).  In this context, the Court of Appeals for the Third Circuit has explained that:

> The noun "transaction" means "[t]he act of transacting or the fact of being transacted," and the verb "transact" means "[t]o do, carry on, or conduct" or "[t]o conduct business."  Am. Heritage Dictionary 1899-1900 (3d ed. 1992).  The verb "avoid" means "[t]o stay clear of" or "[t]o keep from happening" and is synonymous with escape. Id. at 128.  The verb "evade" means "[t]o escape or avoid by cleverness or deceit" or "[t]o fail to make a payment of." Id. at 634.  Under a plain language statutory reading the provision applies when a contributing employer enters into a transaction with a principal purpose of escaping its duty to pay withdrawal liability to the plan or fund.

Id. at 341.

10.   According to section 4221(e)(2)(A)(ii) of ERISA, 29 U.S.C. § 1401(e)(2)(A)(ii), "the plan sponsor shall have the burden to establish, by a preponderance of the evidence, the elements of the claim under section 1392(c) of this title that a principal purpose of the transaction was to evade or avoid withdrawal liability under this subtitle."  29 U.S.C. § 1401(e)(2)(A)(ii).

11.   To meet its burden, the Plan need only establish that
evading or avoiding withdrawal liability was a principal purpose
of the sale transaction; it need not establish that such evasion
or avoidance was the sole or singular purpose of the
transaction.   See Santa Fe Pac. Corp. v. Cent. States, Se. & Sw.
Areas Pension Fund, 22 F.3d 725, 727 (7th Cir. 1994) ("[T]he
imposition of withdrawal liability in a sale of business
situation requires only that a principal purpose of the sale be
to escape withdrawal liability.  It needn't be the only purpose;
it need only have been one of the factors that weighed heavily
in the seller's thinking."); see also Sherwin-Williams Co. v.
N.Y. State Teamsters Conference Pension, Ret. Fund, 158 F.3d
387, 395 (6th Cir. 1998).

12.   For example, one purpose may motivate an employer's
decision to conduct a transaction, while another purpose may
motivate the decision about how to structure this transaction.
As the Court of Appeals for the Sixth Circuit explained in
Sherwin-Williams:

> [T]he language of the MPPAA makes it clear that an employer
> can have more than one principal purpose in conducting a
> transaction.   This is especially true where, as here, one
> principal purpose can be said to motivate the decision
> about whether to sell the company at all, while another
> principal purpose can be said to motivate the decision
> about how to sell the company.

158 F.3d at 395.  In order to establish evade/avoid liability,
it is sufficient that evading or avoiding withdrawal liability

be a principal purpose of structuring the transaction in a particular fashion.  Id.; Santa Fe, 22 F.3d at 728-29.

13.  In order to meet its burden, the Plan must establish that evading or avoiding withdrawal liability was a principal purpose of the transaction, as opposed to a minor or subordinate purpose.  See Santa Fe, 22 F.3d at 727 (an employer should be let "off the hook even if one of his purposes was to beat withdrawal liability, provided however that it was a minor, subordinate purpose, as distinct from a major purpose"); Teamsters Joint Council No. 83 of Va. Pension Fund v. Empire Beef Co., No. 08 Civ. 340, 2011 WL 201492, at *3 (E.D. Va. Jan. 20, 2011) (no evade/avoid liability imposed where "evading withdrawal liability was merely a collateral purpose" of the transaction in question).

## IV. Evading or Avoiding Withdrawal Liability Was Not a Principal Purpose of the Sale Transaction.

14.  The plaintiff has not met its burden of proving by a preponderance of the evidence that a principal purpose of the sale transaction was to evade or avoid withdrawal liability. The evidence instead supports the conclusion that the overarching purpose motivating the Principals' decision to sell Pace Press's assets to DG3 was the desire to avoid a potentially imminent bankruptcy resulting from the serious financial

difficulties Pace Press confronted, a bankruptcy that would have triggered the Principals' liability on the personal guaranties they owed to Merrill Lynch.  Joseph Vitale credibly testified that, in the wake of the direct pay letters issued by Merrill Lynch in August 2008, the Principals viewed the pending deal with DG3 as the only viable option for Pace Press and felt that "if we don't take this deal, there's going to be nothing else, there's no option at all." (Tr. 396.)  The testimony of each of the Pace Press Principals that they would have engaged in the sale transaction even if Pace Press had not owed any withdrawal liability is credible.  (Tr. 297, 398, 419.)

15.  The plaintiff places great emphasis on the fact that the parties to the transaction were aware of the withdrawal liability owed by Pace Press.  However, evade/avoid liability is not established where "the record merely indicates an awareness of withdrawal liability, which is not equivalent to evasive intent." Empire Beef, 2011 WL 201492, at *5 (internal quotation marks and citations omitted).  Here, while the evidence establishes that the Pace Press Principals and DG3 were aware that Pace Press would owe withdrawal liability, there is no evidence that avoidance of this withdrawal liability was a principal purpose of their decision to engage in the sale transaction in question.

16.  Thus, the plaintiff has not proved that a principal purpose of the sale transaction itself was to evade or avoid withdrawal liability.

**V.  The Sale Transaction Was Not Structured with a Principal Purpose of Evading or Avoiding Withdrawal Liability.**

17.  The plaintiff also has not proved that the sale transaction was structured with a principal purpose of evading or avoiding withdrawal liability.

18.  The plaintiff argues that the transaction was structured so as to deprive Pace Press of assets that could have been used to satisfy withdrawal liability.  However, there is no evidence that the defendants could have structured the transaction in such a manner that there would have been assets available to satisfy withdrawal liability, given that Merrill Lynch, as the secured creditor, had a lien on all of Pace Press's assets and the value of this lien exceeded the value of Pace Press's assets.  (Tr. 359.)  All of the money DG3 paid for Pace Press's assets went to Merrill Lynch, with the exception of the $450,000 allocated to the unsecured creditors pool.[1]  (Tr. 330.)  Even after the payment of this money to Merrill Lynch, Merrill Lynch ended up taking a haircut of approximately

---

[1] The plaintiff's expert also mentioned that approximately $10,000 was paid to a trustee.  (Tr. 330.)

$400,000. (Tr. 388.) Thus, there is no evidence that assets would have been available to satisfy withdrawal liability had the defendants structured the transaction differently.

19. The plaintiff contends, however, that the fact that the Plan was excluded from the $450,000 pool set aside for unsecured creditors indicates that the transaction was structured with an intent to evade or avoid withdrawal liability. The plaintiff argues that the Plan was relegated to an inferior, lesser position as compared with other creditors because it was only offered $50,000, which represented a 4% recovery on its claim against Pace Press, while the unsecured creditors that participated in the pool secured a 17.3% recovery of their claims against Pace Press. The plaintiff also asserts that an intent to evade or avoid withdrawal liability can be inferred from the fact that the Plan was given only four days to consider the $50,000 settlement offer and, when it declined the offer, the $50,000 was re-allocated to the unsecured creditors' pool. However, these actions do not suggest that the transaction was structured with a principal purpose of evading or avoiding withdrawal liability. The $50,000 offer was made to resolve any claim by the Plan against DG3; it was not a settlement of the Plan's claim for withdrawal liability against Pace Press. The offer was certainly a reasonable effort to avoid the litigation that has transpired. The $50,000 offer to

the Plan was thus different from the offers to the creditors of Pace Press because the nature of the claim was different.

20.  Moreover, there were logical reasons for the defendants to exclude the Plan from the unsecured creditors' pool.  Mangiaracina testified that the Plan was not invited to participate in the unsecured creditors' pool because Pace Press had not yet effected a complete withdrawal from the Plan; thus, the Plan's claim had not yet accrued.  (Tr. 207, 295.)  Indeed, the Plan did not assert a claim for withdrawal liability until its letter to Pace Press in November 2008, in which it directed a first payment of $34,144.75 to be paid by January 2009.  (Ex. 56.)  The plaintiff's counsel represented at trial that the Plan was not in a position to assert itself as an unpaid creditor until May 2009, after the Plan had provided the proper notices to Pace Press and given it adequate time to respond.  (Tr. 470-71.)  The purpose of the unsecured creditors' pool was to reduce the risk of bankruptcy by encouraging creditors to accept a settlement rather than pursue the full value of their claims against Pace Press.  (Tr. 353.)  Thus, it is logical that the defendants would have sought to restrict the $450,000 pool to those creditors whose claims had already accrued.

21.  The plaintiff argues to the contrary and cites two cases that it claims stand for the proposition that unequal treatment of a withdrawal liability claim as compared to the

claims of other creditors is evidence of an intent to evade or avoid withdrawal liability.  However, the cases cited by the plaintiff do not stand for this proposition.  In those cases, the allegations were not merely that the defendants prioritized the claims of certain creditors over a withdrawal liability claim; instead, the defendants were alleged to have converted funds for their own personal use that could have been used to satisfy withdrawal liability.  See Operating Eng'rs & Pension Trust Fund v. W. Power & Equip. Corp., No. C 10-4460 PJH, 2011 WL 2516775, at *3-4 (N.D. Cal. June 23, 2011) (defendants converted funds that had been contractually allocated by purchasing company for the payment of future withdrawal liability claims for their own personal use in satisfying the judgment of another creditor); Ret. Benefit Plan of Graphic Arts Int'l Union Local 20-B v. Standard Bindery Co., 654 F. Supp. 770, 772-74 (E.D. Mich. 1986) (defendants characterized their own capital infusions to corporation as loans and repaid those loans to themselves without paying the withdrawal liability owed to the pension plan).  The actions the defendants took in this case in attempting to settle the Plan's possible claim against DG3 and the claims of other unsecured creditors do not indicate an intent to evade or avoid withdrawal liability.

     22.  Nothing about the defendants' use of the assets remaining in Pace Press after the sale transaction indicates an

36

intent to evade or avoid withdrawal liability.  Most of the
proceeds from the accounts receivable collected after the sale
transaction went directly to Merrill Lynch, with certain
exceptions to which Merrill Lynch consented that did not include
the payment of withdrawal liability.  (Tr. 235, 276-77.)

    23.  To the extent that the transaction was structured to
reduce the personal guaranties the Individual Defendants owed to
Merrill Lynch, this does not demonstrate that a principal
purpose of the transaction's structure was to evade or avoid
withdrawal liability.  See Empire Beef, 2011 WL 201492, at *3
(no evade/avoid liability where the transaction in question "was
intended to insulate [the defendant] from [the employer's]
creditors generally, not the [union] specifically").  On the
contrary, it reflects a purpose of the transaction from the
standpoint of the Individual Defendants that was unrelated to a
purpose to evade or avoid withdrawal liability.

    24.  The plaintiff also contends that the defendants'
intent to evade or avoid withdrawal liability can be inferred
from the fact that the defendants were aware that the sale
transaction would leave Pace Press with virtually no assets from
which withdrawal liability could be paid.  However, there is a
difference between knowing that the result of the transaction
would be that withdrawal liability would not be paid and
designing the transaction with a principal purpose of achieving

this result.  See Empire Beef, 2011 WL 201492, at *3 n.5

("Arguably, eschewing withdrawal liability was merely an

incidental effect - not an actively contemplated purpose - of

the Agreement.").  Here, while the defendants were aware that,

following the sale, there would be virtually no assets available

to satisfy withdrawal liability (Tr. 405), this was simply the

result of a transaction in which everyone, including the secured

creditor Merrill Lynch, did not get paid in full; it was not a

principal purpose or aim of the transaction or the transaction's

structure.

25.  Thus, the plaintiff has not proved that a principal

purpose of the structure of the transaction was to evade or

avoid withdrawal liability.


**VI.  The Principals' Employment Agreements Do Not Indicate an Intent to Evade or Avoid Withdrawal Liability.**

26.   The plaintiff argues that the defendants' intent to

evade or avoid withdrawal liability is reflected by the fact

that the Principals received "lucrative" employment agreements

with DG3 as part of the sale transaction.  The plaintiff

contends that DG3 paid less than fair market value for Pace

Press's assets and diverted money to the Principals through

their employment agreements that otherwise would have been

included in the purchase price.  However, as discussed above,

the plaintiff's expert's conclusion that DG3 paid less than fair market value for Pace Press's assets is not persuasive. Nor is there any evidence that, absent the employment agreements, DG3 would have agreed to increase the purchase price. To the contrary, without these employment agreements, DG3 may well have paid less for Pace's assets, given that the value of the customer list likely would have decreased without the benefit of the Principals' established relationships with customers. Finally, there is nothing about the amount of the compensation set forth in the employment agreements that suggests that the agreements were offered for an improper purpose such as securing the Principals' cooperation in selling Pace Press at a price below fair market value. To the contrary, as discussed above, these employment agreements were heavily negotiated, reasonable in amount under industry standards, and offered for a legitimate business purpose. Even the plaintiff's expert conceded that the amount of compensation in the employment agreements was reasonable.

27. Moreover, there is no evidence that any proceeds from the sale transaction were diverted to the Principals by way of their employment agreements. Instead, the compensation packages to the Principals were paid in addition to and separately from the $3.35 million purchase price. This case is therefore distinguishable from IUE AFL-CIO Pension Fund v. Herrmann, 9

F.3d 1049 (2d Cir. 1993), on which the plaintiff relies.   In
Herrmann, the Court of Appeals for the Second Circuit considered
an evade/avoid claim in the context of a sale transaction
between Herrmann - the president and sole shareholder of the
selling corporation Locke Manufacturing - and Mowers, the
purchasing corporation.   The court concluded that the
plaintiff's allegations were sufficient to survive a motion to
dismiss, relying in part on the fact that the asset purchase
agreement, like the agreement here, allowed Mowers to "purchase
the entire company except for certain liabilities including the
withdrawal liability." Id. at 1058.   However, in Herrmann, the
plaintiff alleged that the sale transaction had been structured
so as to funnel assets into the hands of Herrmann himself.
Specifically, the plaintiff alleged that the parties lowered the
purchase price and instead gave a $50,000 signing bonus to
Herrmann and that, prior to the sale, Herrmann used a line of
credit from Locke Manufacturing to pay himself an extra bonus of
more than $250,000. Id. at 1053.   In this case, there is no
evidence that the Principals siphoned assets from Pace Press for
their own benefit or that the purchase price was lowered in
order to divert funds to the Principals through their individual
employment agreements.   In addition, while Herrmann, like the
Principals here, was offered an employment agreement with the
purchasing corporation, id., the court did not discuss whether

40

there was a legitimate business reason for the employment
agreement, whether the amount of compensation was reasonable, or
whether Herrmann actually performed work under the employment
agreement.  Herrmann is therefore distinguishable from the
present case and provides no basis for imposing evade/avoid
liability here, where the evidence adduced at trial fails to
show that a principal purpose of the transaction at issue was to
evade or avoid withdrawal liability.

## VII.  DG3 Did Not Have an Intent to Evade or Avoid Pace Press's Withdrawal Liability.

28.  The plaintiff argues that DG3's intent to evade or
avoid withdrawal liability can be inferred from the fact that
the sale transaction was structured as an asset purchase rather
than a stock purchase, thereby allowing DG3 to avoid the
assumption of Pace Press's withdrawal liability.[2]  However, DG3
was not an employer in the Plan and had no obligation to pay

---

[2]  Some courts have found that only the seller's motive and not
the purchaser's motive is relevant to evade or avoid liablity.
See Santa Fe, 22 F.3d at 730 (framing the relevant question as
"whether the avoidance of withdrawal liability by the seller
(not necessarily by the purchaser as well) is one of the
principal purposes of the transaction").  But see Dorn's
Transp., Inc. v. Teamsters Pension Trust Fund of Phila. &
Vicinity, 787 F.2d 897, 902 (3d Cir. 1986) (concluding that both
the seller and the buyer must intend to evade or avoid
withdrawal liability to meet the test in § 1392(c)).  In this
case, because the plaintiff has not proved that either the
seller or the purchaser intended to evade or avoid withdrawal
liability, it is not necessary to resolve this question.

withdrawal liability to the Plan or to assume Pace Press's
withdrawal liability when it purchased Pace's assets.  (Tr.
168.)  While DG3 chose not to assume Pace Press's withdrawal
liability, there is a difference between declining to assume
withdrawal liability that one never had the obligation to pay
and evading withdrawal liability that one is already legally
obligated to pay.  Moreover, Lindfeldt credibly testified that
the principal reason for structuring the sale transaction as an
asset purchase rather than a stock purchase was to permit DG3 to
avoid assuming all of the obligations and liabilities of Pace
Press.  Lindfeldt testified that it would have been "bad
business" to structure the transaction as a stock sale because
DG3 considered Pace Press's assets to be far less than its
liabilities, even excluding pension liabilities.  (Tr. 169-70.)
This was plainly true in view of the discounts Merrill Lynch and
the unsecured creditors took in resolving their claims against
Pace Press.  In addition, a stock transaction would have
required additional due diligence concerning pending or
threatened litigation and other aspects of the operations of
Pace Press.  (Tr. 170.)  Thus, Lindfeldt's testimony is wholly
credible that, even if there had been no withdrawal liability,
DG3 would have structured the transaction as an asset purchase
rather than a stock purchase.  (Tr. 170.)

29.   The plaintiff also contends that DG3's intent to evade or avoid withdrawal liability can be inferred from the fact that DG3 brought up Pace Press's withdrawal liability regularly and sought a general release by the Plan from any potential withdrawal liability claim in exchange for a payment of $50,000. However, DG3's concern with the prospect of future litigation and efforts to settle future claims do not reflect an intent to evade or avoid withdrawal liability.  See Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc.-Pension Fund v. Centra, 983 F.2d 495, 506-07 (3d Cir. 1992) (rejecting plaintiff's argument that settlement agreement's release of purchasing company was an attempt to evade or avoid withdrawal liability, reasoning that "the purpose of settling a case is always to avoid the possibility of a larger adverse verdict at trial" and "cannot be characterized as [an] attempt[] to avoid liability within the meaning of [§ 1392]").  The effort to avoid the litigation by a settlement payment of $50,000 is not indicative of an intent to evade or avoid withdrawal liability; it was simply prescient.

30.   Thus, the plaintiff has not proved that DG3 intended to evade or avoid withdrawal liability.

## CONCLUSION

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law.  The Court has considered all of the arguments by all of the parties.  To the extent not specifically addressed above, such arguments are either moot or without merit.  The Court finds that evading or avoiding withdrawal liability was not a principal purpose of the transaction within the meaning of 29 U.S.C. § 1392(c).  Accordingly, the plaintiff is not entitled to recover withdrawal liability from the defendants on the basis that a principal purpose of the sale transaction was to evade or avoid the withdrawal liability otherwise owing to the Plan.

The Clerk is directed to close all pending motions.  The defendants are directed to submit a proposed judgment within five (5) days.  The plaintiff may submit any counter-judgment three (3) days thereafter.

SO ORDERED.

Dated: New York, New York
      June 16, 2012

                                John G. Koeltl
                    United States District Judge